AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original



**LODGED**
CLERK, U.S. DISTRICT COURT
**3/26/26**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California



**FILED**
CLERK, U.S. DISTRICT COURT
**3/26/2026**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ts _____ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>KYLE ALEXANDER MONTEITH,<br><br>Defendant(s) | Case No.  2:26-mj-01747-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 2, 2025 and April 4, 2025 in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1708 | Mail Theft and Possession of Stolen Mail |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Oliver Tan*
*Complainant's signature*

Oliver Tan, Postal Inspector
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      March 26, 2026

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Stephanie S. Christensen, U.S. Magistrate Judge
*Printed name and title*

AUSA:_Brenda N. Galván x0715

## AFFIDAVIT

I, Oliver Tan, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Kyle Alexander MONTEITH ("MONTEITH") for a violation of 18 U.S.C. § 1708 (Mail Theft and Possession of Stolen Mail).

2.    This affidavit is also made in support of applications for warrants to search the person of MONTEITH, as described more fully in Attachment A, for evidence, fruits, or instrumentalities of a violation of 18 U.S.C. § 1708 (Mail Theft and Possession of Stolen Mail) (the "SUBJECT OFFENSE"), as more fully described in Attachment B.  Attachments A and B are incorporated by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all my knowledge of the investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## II. BACKGROUND OF AFFIANT

4. I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been since July 2023. I completed a 16-week basic training course in Potomac, Maryland, which included training in the investigation of mail related crimes. I am currently assigned to the Los Angeles Division, Alameda Mail Theft and Violent Crimes Team, where my responsibilities include the investigation of crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of the United States mail, possession of stolen mail, robberies of Postal employees, and crimes related to the use, theft or counterfeiting of postal keys and locks. I also investigate crimes in connection with access devices that include credit cards and debit cards, identity theft, and the unauthorized use of other people's information for financial gain, as these criminal schemes are often perpetrated through the U.S. mail.

5. Through my investigations, my training and experience, and discussions with other law enforcement personnel, I have become familiar with the tactics and methods employed by those who conduct mail theft, robberies, bank fraud schemes using stolen and/or counterfeit checks, identity theft, and access device fraud.

## III. SUMMARY OF PROBABLE CAUSE

6. Between April 2, 2025, and April 4, 2025, Kyle Alexander MONTEITH ("MONTEITH") conducted a series of mail thefts. Specifically:

2

a.    On April 2, 2025, MONTEITH stole mail at 930 5th Street, Santa Monica, California.

b.    On April 4, 2025, MONTEITH stole mail at 1133 9th Street, Santa Monica, California.

7.    On May 15, 2025, Santa Monica Police Department ("SMPD") officers conducted a traffic stop on MONTEITH's vehicle.  During a search of MONTEITH's person, SMPD officers found counterfeit USPS Mailbox keys, a genuine USPS Mailbox key, various access devices for people other than MONTEITH, lock pick tools, a pocketknife, and a plastic bag containing methamphetamine.

8.    On June 23, 2025, SMPD officers searched MONTEITH's vehicle pursuant to a warrant and found various mail, access devices, checks, tax documents, identification cards, and passports for people other than MONTEITH.

IV. <u>**STATEMENT OF PROBABLE CAUSE**</u>

9.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

10.    Beginning on April 2, 2025, and continuing through April 4, 2025, a series of mail thefts occurred within the Central District of California.  In each mail theft incident, MONTEITH was observed by residential surveillance cameras accessing residential mailboxes.  Two of these mail theft incidents are described below:

3

**A.    Mail Theft at 930 5th Street, Santa Monica, California on April 2, 2025**

11.   On April 2, 2025, SMPD Officer Paul Pulido responded to an apartment building located at 930 5th Street, Santa Monica, CA 90403 for a report of mail theft that occurred at that location.  From my review of reports, I know that upon his arrival, Property Manager J.M. told him the following:

a.    At approximately 09:00 a.m., J.M., while viewing the building's surveillance camera monitors, observed one male, later identified as MONTEITH, ("S1") and one female ("S2") enter the apartment building.  J.M. did not recognize either individual as residents.  The two individuals opened the apartment mailbox panel and removed mail from multiple mailboxes.

b.    J.M. then left his room and approached the mailboxes to confront those who he believed to be mail thieves. While walking towards the mailboxes, J.M. observed the two individuals placing the stolen mail into duffle bags.  The two individuals left the building immediately after J.M. confronted them.  J.M. provided Officer Pulido with surveillance footage of the incident.

12.   SMPD Detective Sean Baker reviewed the surveillance video and observed the following:

a.    On April 2, 2025, at approximately 09:09 a.m., S1 and S2 approaches the front of the building at 930 5th Street. S1 approaches the front door callbox and removes a key from his pocket and uses it to unlock the door.  Once inside the

4

building, S1 and S2 approach the mailbox cluster. Using the same key that S1 used to unlock the front door, S1 unlocked and opened the mailbox cluster. S1 and S2 removed mail from the mailboxes and placed them into duffle bags. At approximately 09:11 a.m., S1 and S2 fled the location. A still image of S1 as he appeared in the surveillance is included below:



13. Detective Baker, utilizing SMPD resources with the Los Angeles County Regional Identification System Photo Manager, obtained a prior booking photo of MONTEITH. MONTEITH's booking photo matched the surveillance image of S1. Detective Baker then accessed California Department of Motor Vehicle databases and obtained MONTEITH's driver license photo. MONTEITH's driver license photo also matched the surveillance image of S1.

**B.    Mail Theft at 1133 9th Street, Santa Monica, California on April 4, 2025**

14. On April 8, 2025, SMPD Officer Christopher Dolloff responded to an apartment building located at 1133 9th Street, Santa Monica, CA 90403 for a report of mail theft. From my

5

review of reports, I know that upon his arrival, resident K.P. told him the following:

a.    K.P. reviewed the building's surveillance video after discovering that her FedEx package was missing.  From the surveillance video, K.P. observed one male ("S3") and one female ("S4") carrying packages from a neighboring building to a white Volkswagen Tiguan parked in front of her residence.  S3 and S4 placed the packages in the Tiguan and approached K.P.'s residence.

b.    S3 and S4 accessed the intercom system and entered K.P.'s building.  S3 and S4 accessed the mailbox cluster and stole mail and packages from the building.

15.  Detective Baker reviewed the surveillance video and observed the following:

a.    S3 and S4 appeared to be the same suspects from the mail theft incident at 930 5th Street.  MONTEITH's photos matched the surveillance image of both S1 and S3.  The white Volkswagen Tiguan used by the suspects had distinct collision damage on the front passenger side fender.

16.  Detective Baker, utilizing SMPD Autonomous License Recognition Programs ("LPR"), identified a white 2019 Volkswagen Tiguan bearing CA license plate number 8GRU366 (the "Tiguan") that had a matching collision damage as the suspect vehicle. Additional LPR records revealed the Tiguan was in the area before and after both mail theft incidents.

17.  MONTEITH was also observed wearing the same baseball hat with a upside down "LA" logo at both mail theft incidents.

6



C.    **SMPD Traffic Stop of the Tiguan**

18.    On May 15, 2025, SMPD Officer Freddie Alvarenga and Officer Anthony Cornejo Padilla were notified by SMPD LPR's safety alert system regarding the Tiguan as a vehicle of interest.  LPR cameras observed the Tiguan traveling northbound on Lincoln Boulevard from Pacific Street.

19.    Officer Alvarenga and Officer Cornejo observed the Tiguan traveling eastbound on the I-10 freeway.  Officer Alvarenga conducted a warrant check of the vehicle license plate and noticed the vehicle registration was suspended in December of 2024.  Officer Alvarenga and Officer Cornejo stopped the Tiguan on the 1500 block of Cotner Avenue near the Santa Monica Boulevard offramp.  Officer Alvarenga and Officer Cornejo identified the driver and sole occupant as MONTEITH.

20.     Officer Cornejo advised MONTEITH of his suspended vehicle registration and had MONTEITH step out of the Tiguan. Officer Alvarenga noticed the clip of a pocketknife protruding from MONTEITH's shorts pocket.  Officer Cornejo proceeded to remove the pocketknife from MONTEITH and conducted a safety pat-down of MONTEITH's person. Officer Cornejo asked for MONTEITH's

7

permission to remove items from MONTEITH's pockets.  MONTEITH consented.  The following items were removed from MONTEITH's pockets:

      a.   A keyring with approximately six keys attached, including one genuine USPS Mailbox key and multiple counterfeit USPS Mailbox keys.

      b.   Two lock picking tools.

      c.   A plastic bag containing a white crystalline substance consistent in appearance with methamphetamine.

      d.   Eight access devices for people other than MONTEITH.

21.  The Tiguan was subsequently impounded per California Vehicle Code 22651(h) and transported to All City Tow in Culver City.

**D.    SMPD Executed a CA Search Warrant on the Tiguan**

22.  On June 23, 2025, the Honorable Kathleen Blanchard, Superior Court Judge for the State of California, County of Los Angeles authorized a search warrant for the Tiguan.  Detective Baker searched the Tiguan and recovered the following items:

      a.   A baseball hat with a upside down "LA" logo consistent with the one worn by MONTEITH observed in both mail theft incidents described above;

      b.   Lockpicking tools; and

      c.   Items for people other than MONTEITH, including:

          i.   Mail;

          ii.  Checks;

          iii. Passports;

iv.   Driver Licenses;

v.    Access Devices;

vi.   Tax Documents; and

vii.  Miscellaneous Documents

### V.   TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

23.   Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a.    People who steal mail are often involved in fraud and identity theft crimes.  These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.    It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal

9

identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

c.    Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

d.    It is also common for mail and identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

e.    It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

10

f.    Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators to conduct their business. Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

g.    Individuals engaged in mail and identity theft often use multiple digital devices.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

24.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files, or remnants of such files, months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file from a computer, the data contained in the file does not disappear; rather, the data

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

remains on the hard drive until it is overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

12

filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

25.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for several reasons, including the following:

a.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

26.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

13

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who was in possession of a device or had the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MONTEITH's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MONTEITH's face with his or her eyes open to activate the facial-, iris-,

14

and/or retina-recognition feature.  This request applies only to such devices recovered in searches of the person of MONTEITH.

27.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

28.    For all the reasons described above, I submit that there is probable cause to believe that Kyle Alexander MONTEITH committed a violation of 18 U.S.C. § 1708 (Mail Theft).  I further submit that there is probable cause to believe the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES, will be found on the person of Kyle Alexander MONTEITH as further described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 26th day of
March 2026.

_____
HONORABLE STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE

15